IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jerry Jackson, #81094-071, )<br>)<br>　　　　　　　　Plaintiff, )<br>)<br>vs. )<br>)<br>J. V. Smith, Warden; J. Serrano, M.D.; )<br>L. Rogers, I.C.C./I.D.; K. Walker, P.A.; )<br>A. Saha, P.A.; H. Watts, Board of )<br>Appeals; Louisa Fuertes-Rosario; and )<br>FNU Sero, )<br>)<br>　　　　　　　　Defendants. )<br>　　　　　　　　　　　　　　　　 ) | Civil Action No. 6:04-2190-GRA-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

　　　　　The plaintiff, a federal prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983. This matter is before the court on the defendants' motion for summary judgment.

　　　　　Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the District Court.

　　　　　The plaintiff filed this action pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the defendants collectively violated his First, Fifth, Sixth, and Fourteenth Amendment rights. The plaintiff named as defendants Joseph Smith, Warden of the United States Penitentiary Lewisburg in Pennsylvania and the former Warden of FCI Edgefield; Dr. Jose Serrano, the Clinical Director at FCI Edgefield; Linda Rogers, the Infectious Disease Coordinator at FCI Edgefield; Kim Walker, the former Mid-Level Practitioner at FCI Edgefield; Arunava Saha, Mid-level

Practitioner; Harrell Watts, National Inmate Appeals Administrator; John LaManna, Warden of FCI Edgefield; Luisa Fuertes-Rosario, Health Services Administrator at FCI Edgefield; and "FNU Sero." He requested $100,000 in punitive damages from each defendant "for the unnecessary and wanton infliction of pain and suffering by defendant's hand, through retaliatory acts for exercising his substantive rights," $1,000,000 in punitive damages jointly from the defendants for the "heart failure received for the defendants denying required medication, for exercising his substantive right entitled by the Constitution," and any other relief the court deems just and appropriate (comp. 9).

On May 2, 2005, the defendants filed a motion to dismiss or, in the alternative, for summary judgment. By order filed on May 12, 2005, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The plaintiff filed a response to the defendants' motion on June 21, 2005.

## **FACTS PRESENTED**

The plaintiff arrived at FCI Edgefield on April 3, 2003. On this date during his medical intake screening, the plaintiff was asked by defendant Saha to submit to the mandatory tuberculosis (TB) screening by taking a PPD skin test. The plaintiff stated to defendant Saha that he previously had an allergic reaction to the PPD skin test, and he could only take a chest x-ray. The plaintiff's medical records showed he had previously taken the PPD skin test in 1996, 1997, and 2001, without having a reaction or problem. *See* Ex. 4 and 5 to defendants' motion to dismiss.[1] The medical records showed that on February 8, 2002, when the plaintiff arrived at FCI Manchester, he refused to take the PPD skin test. Although it was documented several places in the medical records that the

---

[1]All exhibit references herein shall be to the exhibits attached to the defendants' motion to dismiss.

2

plaintiff refused to take a PPD skin test at FCI Manchester, there was no indication of an allergic reaction to the PPD skin test in 2001. *Id*. Additionally, the plaintiff did not indicate in the Medical History Report he completed on April 3, 2003, that he had an allergic reaction from taking the PPD skin test. The plaintiff's Medical History Report indicated that he had suffered an allergic reaction only to penicillin and aspirin. *Id*. and Ex. 6.

As a result his refusal to take a PPD skin test, the plaintiff was placed in Administrative Detention in the Special Housing Unit (SHU) at approximately 3:30 p.m. on April 3, 2003. This was in accordance with BOP policy, which allows placement in Administrative Detention in SHU when an inmate refuses an order. At approximately 4:00 p.m., on the same day, the plaintiff received notice[2] as to why he was placed in SHU.

TB is a problem in correctional facilities in the United States, and effective TB prevention and control in such facilities is necessary to reduce TB rates, and eventually to eliminate TB in the United States. All correctional facilities have a designated person or group of persons who have experience in infection control, occupational health, and engineering to be responsible for the TB infection-control program in the facility. BOP policy states "TB screening is mandatory for all inmates. . . . The PPD shall be the primary screening method unless this diagnostic test is contraindicated; then a chest x-ray is obtained." *See* Ex. 2. "Any inmate who refuses to submit to TB screening shall be subject to an incident report for failure to follow an order. . . . Inmates who refuse TB screening shall not be placed in medical isolation unless there is a clinical indication for such isolation. Local institution policy shall dictate whether inmates who are subject to an incident report

---

[2] BOP policy requires an inmate to receive notice within 24 hours after being placed in Administrative Detention detailing the reasons for placing the inmate in Administrative Detention. *See* Ex. 7, Chpt. 9, pg. 8. The plaintiff received notice approximately 30 minutes after he was placed in Administrative Detention. *See* Ex. 8, Notice. The notice informed the plaintiff he was placed in Administrative Detention pending review by the Captain to see if he could be placed in general population at the institution. *Id.*

3

for failure to follow an order are placed in administrative detention/segregation." *Id.*; *see also* Ex. 3.

During the plaintiff's medical intake screening on April 3, 2003, defendant Saha reviewed the "Medical Summary of Federal Prisoner In-Transit Form" (hereinafter "In-Transit Form") which was forwarded with the plaintiff when he was transferred to FCI Edgefield. The In-Transit Form listed the medication[3] the plaintiff had received prior to his transfer to FCI Edgefield.[4] *See* Exs. 4, 5, and 6. Since the plaintiff was transferred from another Bureau of Prisons ("BOP") institution, he was allowed to keep the medication he had while in transit.[5] The plaintiff was informed by medical staff that after his medical record had been reviewed by medical staff, he would receive new prescriptions for any medications that were medically indicated.[6] On April 8, 2003, the plaintiff received six prescriptions[7] for his various ongoing medical conditions.

---

[3] The In-Transit form indicated the plaintiff had the following medications while he was in transit: Montelukust, Albuterol meter dose inhaler, and Triamcinolone meter dose inhaler for bronchial asthma, triple antibiotic ointment for his skin problem, and Clonidine, Nifedipine, and Hydrochlorothiazide for high blood pressure. *See* Ex. 4 and 5, pg. 1.

[4] When an inmate who is on a medication is transferred from one institution to another institution, the institution that sends the inmate provides enough medication for an inmate for the length of the time it takes to get to the new institution. Once the inmate arrives at the new institution, the inmate is evaluated by medical staff and receives new prescriptions where appropriate. *See* Ex. 4.

[5] When an inmate transfers from one BOP facility to another BOP facility, the inmate is allowed to keep any medications he has while he was in transit. If an inmate self surrenders (from the street) or is brought to a BOP facility from somewhere other than a BOP facility, any medication the inmate has with him while he was in transit is disposed of by medical staff. Regardless of where the inmate arrives from, medical staff at the receiving facility will review the inmate's history, and new prescriptions will be given if medically indicated. *See* Ex. 4.

[6] When an inmate arrives at FCI Edgefield, his medical record is sent directly to the Health Services Department for review. Meanwhile, the inmate is examined by medical staff in the intake processing area of the institution. Results of such examination are recorded on the Medical Intake Screening form by medical staff, and the inmate is asked to fill out a Medical History form. Thereafter, the two forms are taken to the Health Services Department to be reviewed along with the inmate's complete medical record. *See* Ex. 4.

[7] The plaintiff received a prescription of Albuterol meter dose inhaler and Triamcinolone meter dose inhaler for bronchial asthma, triple antibiotic ointment for his skin problem, and Clonidine, Nifedipine, and Hydrochlorothiazide for high blood pressure. *See* Ex. 4 and 5, pgs. 51 & 163.

4

Although the plaintiff was placed in SHU on April 3, 2003, the medical records indicate he did not seek medical attention until April 15, 2003.[8] The medical records reveal that during the plaintiff's medical examination by defendant Walker, he indicated he had asthma and had been congested since the night before. Defendant Walker noted in the medical records that the plaintiff requested a prescription for prednisone. After testing his peak flow, which was low, the medical record indicates defendant Walker initially prescribed a short course of prednisone to the plaintiff and then administered a power Nebulizer (breathing treatment). After the breathing treatment, the plaintiff's peak flow increased and he stated that he felt better. Before the examination was over, defendant Walker consulted with defendant Serrano about the plaintiff's request for prednisone. At that time, defendant Serrano determined there was no medical reason for the plaintiff to have a prescription for prednisone because (1) his peak flow had increased after the power Nebulizer treatment, (2) he told medical staff he felt better after the power Nebulizer treatment, and (3) prednisone can have an adverse impact on TB testing or patients with latent TB, i.e., it can cause a false negative TB test result and activate latent TB.[9] Therefore, the plaintiff was encouraged to continue taking the other medications prescribed on April 8, 2003, for his bronchial asthma, and he was given more medication for his elevated blood pressure. The prescription for prednisone was voided by defendant Walker. *See* Exs. 4 and 5.

On April 15, 2003, defendant Rogers, as the Infectious Disease Coordinator, was notified that the plaintiff refused to take the PPD skin test. Defendants Rogers and

---

[8] A medical staff member goes to SHU every day of the week to attend to the medical needs of the inmates housed in that Unit. *See* Ex. 4.

[9] The BOP follows the Center for Disease Control Guidelines (CDC). The CDC Guidelines indicate the presence of prednisone in the bloodstream can inhibit a PPD skin test, i.e., cause a false negative result and activate latent TB. *See* Ex. 4 and 11, Controlling TB in Correctional Facilities, Ex. 12, Targeted Tuberculin Testing and Treatment of Latent Tuberculosis Infection, and Ex. 13, Management of Tuberculosis (Federal Bureau of Prisons–Clinical Practice Guidelines). Prednisone is generally not prescribed until after a PPD skin test result is obtained. *Id.*

5

Serrano reviewed the plaintiff's medical record for allergies and other clinical contraindications prior to meeting with him to discuss the TB test. There was nothing in the plaintiff's medical record that indicated he suffered an allergic reaction to the PPD skin test or had other clinical contraindications to the test. Thereafter, the plaintiff was brought to the Health Services Department for counseling with defendants Serrano and Rogers[10] concerning the importance of taking the PPD skin test.[11] When questioned about the claimed allergic reaction, the plaintiff told medical staff he had developed a rash to his axillary (armpit) and groin area where he first took the PPD test in 2001. The plaintiff stated that the PPD skin test was reported as negative. The plaintiff stated he did not want to go through the process of developing this type of rash again. After it was explained to him that the reaction to the PPD skin test is localized to the site of the administration of the solution and that a rash anywhere else would not be the result of administering the PPD skin test, he agreed to think about having the PPD skin test. *See* Exs. 4, 5 and 14.

The following day, defendant Serrano contacted the Health Services Division of the Central Office requesting authorization to take a chest x-ray of the plaintiff's lungs. Authorization was given, and the chest x-ray was completed on this same day. The official results of the x-ray were received on April 21, 2003, which indicated the plaintiff did not have active TB. The plaintiff was released from SHU upon receipt of those results. *See* Exs. 4 and 5.

---

[10] During the conversation with defendant Rogers, the plaintiff asked if staff could physically hold him down and take such test. Defendant Rogers told him that policy did allow staff to forcibly administer such test if he continuously refused and an x-ray was not clinically indicated. *See* Ex. 2 & 4, Ex. 5, pg. 53, and Ex. 7 & 11.

[11] The PPD skin test is the most reliable diagnostic aid available and is recommended by the CDC to identify TB infection. *See* Ex. 4, and Ex. 11-13. Chest x-rays are only given in the alternative when the PPD skin test is clinically contraindicated. *Id.* Chest x-rays do not always reveal if an individual has been exposed to TB; therefore, the BOP relies upon the PPD skin test in order to obtain the most reliable TB screening results. *Id*.

6

The plaintiff sent a letter to the Regional Director dated April 8, 2003, inquiring about his placement in SHU at FCI Edgefield. *See* Exs. 15 and 16. The letter was forwarded to defendant Smith on April 25, 2003, by the Regional Director for a response. On May 6, 2003, defendant Smith responded to the letter, explaining that the SHU placement was due to the plaintiff's initial refusal to take a PPD skin test. Defendant Smith further stated that since the time the letter was written an x-ray cleared him and he was released from SHU. *See* Exs. 16 and 17.

On May 1, 2003, the plaintiff appeared at sick call with complaints about his asthma, asking for prednisone and Singulair (Montelukust). Examination revealed that the plaintiff was not in any acute respiratory distress, but did indicate he had a bilateral expiratory rhonchi.[12] A breathing treatment was administered which improved the plaintiff's peak flow, and thus prednisone was not medically indicated. The plaintiff was advised to continue his current treatment plan for his asthma[13] and return if needed. The plaintiff was also informed that he was scheduled to see a staff physician the next day in the Chronic Care Clinic. *See* Exs. 4, 5 and 6.

On May 2, 2003, the plaintiff was seen by defendant Serrano in the Chronic Care Clinic. The plaintiff stated he "[had] had several days of wheezing, coughing" and had doubled, even quadrupled, his dose of his albuterol inhaler. *See* Exs. 4 and 5. The plaintiff also requested soft shoes, due to old injury to his left ankle. Examination revealed his blood pressure was controlled (B/P-107/78); his spirometry test[14] was 300; he was not in

---

[12]Rhonchi is commonly called "wheezing." *See* Ex. 18, Rhonchi, Health, All Refer Symptoms Guide. Rhonchi is a high-pitched whistling sound produced by air flowing through narrow breathing tubes, especially the smaller ones deep in the lung. It is a common finding among those who suffer from asthma. *Id.*

[13]The BOP has Clinical Guidelines to follow in the treatment of federal inmates with asthma. *See* Ex. 19, Federal Bureau of Prisons, Clinical Practice of Guidelines, Management of Asthma, November 2000. The treatment provided to the plaintiff by medical staff at FCI Edgefield is in accordance with such Guidelines. *Id.*; *see also* Ex. 4 & 5.

[14]Forced expiratory volume in one second. *Id.*

7

acute respiratory distress; and his lungs presented wheezes and rhonchi. The April chest x-ray was reviewed which reported:

> The heart is not enlarged. The lungs are clear. Impression: THERE IS NO EVIDENCE OF ACTIVE CARDIOPULMONARY DISEASE.

*See* Exs. 4 and 5. Upon physical examination, the plaintiff's feet revealed a decreased arch size in the left foot. The examination also indicated no deformities, normal neurovascular findings, normal, and a slight swelling in the left ankle. Although the plaintiff claimed he had a fracture to the left ankle, defendant Serrano found no evidence of a fracture and no clinical indication for the plaintiff to wear soft shoes.[15] *See* Ex. 2. Since the plaintiff's test results indicated his triglycerides were slightly elevated (253 mg/dl), he was told to avoid fatty foods. The plaintiff was also given an immediate power Nebulizer treatment with albuterol to treat the bronchial asthma. The plaintiff was prescribed prednisone, a metered dose steroid inhaler, Septra-DS (an antibiotic), and theophillin to treat his asthma. *See* Exs. 4 and 5.

On May 22, 2003, and June 2, 2004, the plaintiff was seen and treated for pain he was experiencing in both knees. *See* Exs. 4 and 5.

On June 13, 2003, the plaintiff was seen during sick call requesting soft shoes for his ankle pain. Since an examination revealed the plaintiff's left ankle was tender and mildly swollen, an x-ray of the left ankle was ordered. The plaintiff's request for soft toe shoes was denied pending the x-ray results. *See* Exs. 4 and 5.

On July 17, 2003, x-rays of the plaintiff's left ankle was taken. On July 21, 2003, the radiological exam reported "no evidence of fracture or other significant bony

---

[15]According to Program Statement 6000.05, Health Services Manual, Section 18, "Foot Problems," "[m]ost inmates can be fitted with standard institution shoes. The fitting of regular-issue shoes is the responsibility of the clothing issue department; inmates should be referred there if they come to sick call for properly fitted shoes. Every clothing issue department should have a standard foot measuring device (i.e., Broderick) that gives readings both length and width. **Physicians may not order shoes or orthotic devices unless there is definite clinical indication.**" *See* Ex. 2, Chpt. VI, pg. 20 (emphasis added).

abnormality. There is some tissue swelling about the joint." Therefore, there was still no medical indication for the plaintiff to wear soft shoes. *See* Exs. 4 and 5.

On July 28, 2003, the plaintiff was seen during Chronic Care Clinic. The plaintiff stated he was using the steroid metered dose inhaler, but he requested prednisone pills, claiming his asthma symptoms were worse at that time of year. All of the plaintiff's previous prescription were renewed and he was given a prescription for prednisone to help treat his asthma symptoms. The plaintiff again requested a soft shoe pass but medical staff informed him that the July 17, 2003, x-ray findings did not indicate a medical reason for soft shoes. *See* Exs. 4 and 5.

On August 6, 2003, the plaintiff filed an administrative remedy regarding his placement in SHU for refusing a PPD skin test. *See* Ex. 20. Attached to his administrative remedy was a letter addressed to defendant Smith regarding this same issue dated August 6, 2003, the same date of his administrative remedy.[16] On September 5, 2003, Acting Warden Tyrone Allen responded to the plaintiff's administrative remedy. The response detailed the chronology of events surrounding the plaintiff's refusal to take the PPD skin test and his placement and subsequent release from SHU. *See* Ex. 22.

The plaintiff appealed this administrative remedy to the Regional Director and the National Inmate Appeals Administrator, who both upheld the Acting Warden's response. *See* Exs. 23, 24, 25 and 26.

On October 2, 2003, the plaintiff was seen by defendant Saha during sick call complaining of shortness of breath and left ankle pain. The plaintiff requested prednisone and soft shoes. Defendant Saha consulted with the Staff Medical Officer, who authorized a short course of prednisone tablets for four weeks, but denied the plaintiff's soft shoes

---

[16] A review of Defendant Smith's log for all correspondence sent to Defendant Smith from inmates does not indicate The plaintiff sent Defendant Smith such letter. See Exhibit 21, Declaration of Mary R. Beth.

request since his current condition did not meet the institution criteria for a soft shoe permit. *See* Exs. 2, 4, 5 and 6..

On October 20, 2003, the plaintiff was seen during in the Chronic Care Clinic by the Medical Officer.  The plaintiff stated he was still using the steroid oral meter dose inhaler and the albuterol oral meter dose inhaler.  All medication for the plaintiff was renewed except the prednisone, which was no longer medically indicated.  The plaintiff again requested light weight shoes, due to leg swelling.  Since the plaintiff was still complaining about his feet and/or his leg swelling, he was referred for a consultation with an orthopaedic surgeon.  *See* Exs. 4 and 5.

On November 12, 2003, the plaintiff was evaluated by the consultant orthopaedic surgeon.  The plaintiff told the consultant that "he broke his ankle several years ago, now it hurts."  He stated he wanted a soft shoe because "he thinks he will have less weight."  After the examination, the orthopaedic surgeon diagnosed the plaintiff with a meniscoid ankle, for which he recommended non-steroidal medication and stretching exercises.  He did not recommend light weight or soft shoes.  *See* Exs. 4 and 5.

On November 21, 2003, the plaintiff was seen during sick call complaining of asthma problems and requesting prednisone tablets.  The plaintiff did not appear to be in acute respiratory distress.  A spirometry test was conducted with a result of 200, which is below normal.  A power Nebulizer was ordered for the plaintiff, but he refused treatment because he wanted prednisone tablets.  The plaintiff signed a medical treatment refusal form which explained the treatment recommended by medical staff and documented his refusal of the treatment.  The plaintiff was told to return to sick call if needed, advised to continue his current treatment plan for his asthma, and informed that prednisone tablets were not medically indicated at that time. *See* Exs. 4 and 5.

On December 15, 2003, the plaintiff was seen during sick call complaining of shortness of breath.  After an examination by defendant Saha, a power Nebulizer treatment

was administered. After the breathing treatment, defendant Saha consulted with the staff physician regarding whether an oral steroid was medically indicated. At that time, medical staff determined that it was medically indicated and, thus, the plaintiff was given a prescription of prednisone. *See* Exs. 4, 5, and 6.

Since December 15, 2003, the plaintiff has been seen in the Chronic Care Clinic and during sick call for his bronchial asthma approximately 18 times. Medical staff has continued to periodically prescribe prednisone tablets and other medications to treat the plaintiff's bronchial asthma. In their best medical judgment, it is not appropriate to treat the plaintiff with prednisone for an extended period of time. *See* Exs. 4, 5 and 6.

On May 25, 2004, the plaintiff filed an administrative remedy stating that FCI Edgefield medical staff was refusing to honor a shoe pass permit issued to him from FCI Manchester over two years ago. *See* Exs. 27 and 28. On June 14, 2004, after a review of the plaintiff's medical records, defendant LaManna responded to the plaintiff's administrative remedy. The response stated that the plaintiff had been seen by a specialist, who recommended a certain type of medication and perform stretching exercises for the plaintiff to do with his left ankle. The specialist did not recommend light weight or soft shoes. *See* Ex. 29.

The plaintiff appealed the administrative remedy request to the Regional Director and the National Inmate Appeals Administrator, who both upheld defendant LaManna's response. *See* Exs. 30, 31, 32, and 33.

The plaintiff has been seen by medical staff, including an outside orthopedic specialist, approximately seven times since November 12, 2003, about complaints of his pain in his left ankle or left leg pain. Following the recommendation by the orthopedic specialist, medical staff continued to provide the plaintiff with a non-steroidal medication and encourage him to do the stretching exercises recommended by the specialist. *See* Exs. 4 and 5.

11

## APPLICABLE LAW

As matters outside the pleadings have been presented by the defendants and have not been excluded by this court, the motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) shall be treated as one for summary judgment pursuant to Rule 56. *See* Fed.R.Civ.P. 12(b)(6). Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the

existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

## **ANALYSIS**

The defendants argue that the plaintiff has failed to show a due process violation regarding his placement in SHU. The Supreme Court recognized in *Sandin v. Conner*, 515 U.S. 472, 480 (1995) ,that an inmate does not have a right to remain in general population, and placement in segregation does not implicate due process liberty interest. The Court also recognized to establish the existence of a liberty interest, a prisoner must show that he has been subjected to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id.* at 484. A prisoner can also establish a liberty interest if he can show that the government's action "will inevitably affect the duration of his sentence." *Id.* at 487.

In this case, when he was asked to submit to a PPD skin test, the plaintiff stated he had an allergic reaction the last time he took the PPD skin test. However, the only medical information available to defendant Saha did not confirm this statement, so the plaintiff was placed in administrative detention until his medical records could be reviewed. When the medical records were reviewed, they showed he had previously taken the PPD

skin test in 1996, 1997, and 2001, with no adverse allergic reaction to any of the tests.  On the same day the plaintiff was placed in administrative detention, he was given notice stating the reason for that placement, in accordance with BOP policy.  On April 21, 2003, the plaintiff was released from SHU after his TB test results came back clear.  It is not "atypical or significant" for the plaintiff to be in administrative detention for 19 days to resolve possible infectious disease concerns.  Therefore, the plaintiff's due process rights were not violated when he was placed in administrative detention.

The plaintiff next claims that the defendants retaliated against him by placing him in administrative segregation and "confiscating" his prednisone.  This claim also fails. In order to state a retaliation claim, petitioner "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."  *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994).  As set forth above, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross,* 759 F.2d at 365.

Here, there is nothing more than a "bare assertion" of retaliation.  *See Adams*, 40 F.3d at 75-76.  The plaintiff was placed in SHU on April 3, 2003,  because he refused to take the primary TB test, i.e., the PPD skin test.  He did not request prednisone until April 15, 2003.  At that time, defendant Serrano determined there was no medical reason for the plaintiff to have a prescription for prednisone because (1) his peak flow had increased after the power Nebulizer treatment, (2) he told medical staff he felt better after the power Nebulizer treatment, and (3) prednisone can have an adverse impact on TB testing or patients with latent TB, i.e., it can cause a false negative TB test result and activate latent TB.  A chest x-ray was performed on April 16, 2003, and the official results of the x-ray were received on April 21, 2003, which indicated the plaintiff did not have active TB.  The plaintiff was released from SHU upon receipt of those results.  Based upon the foregoing, the plaintiff has failed to show either that the retaliatory act was taken in

response to the exercise of a constitutionally protected right or that the act itself violated such a right. Accordingly, the claim fails.

Next, the plaintiff claims that the defendants were deliberately indifferent to his serious medical needs. Deliberate indifference by prison personnel to an inmate's serious illness or injury is actionable under 42 U.S.C. §1983 as constituting cruel and unusual punishment contravening the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Id.* at 102. This obligation arises from an inmate's complete dependency upon prison medical staff to provide essential medical services. *Id*. The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id*. at 105. Instead, it is only when prison officials have exhibited "deliberate indifference" to a prisoner's "serious medical needs" that the Eighth Amendment is offended. *Id.* at 104. As such, "an inadvertent failure to provide adequate medical care" will not comprise an Eighth Amendment breach. *Id*. at 105-106.

The plaintiff offers nothing but his own assertions to show that he received inadequate medical care. The defendants admit that the plaintiff's asthma constitutes a "serious medical need" (def. m.s.j. 27). However, the medical records discussed above show that the medical staff at FCI Edgefield treated the plaintiff's asthma, although it might not have always been with his drug of choice. He was allowed to keep the medication he had while in transit to the prison, and he was informed by defendant Saha that he would receive new prescriptions for any medications that were medically indicated after the medical staff reviewed his records. On April 8, 2003, he received six prescriptions, three of which were for his bronchial asthma. He was then placed in the Chronic Care Clinic to be examined by the Staff Physician or Clinical Director to monitor and treat his ongoing symptoms associated with his bronchial asthma and high blood pressure. The plaintiff did

not seek medical attention until 12 days after he was placed in SHU. At that time, he asked for a prescription for prednisone which, as described above, was not given after a breathing treatment increased the plaintiff's peak flow and made him feel better. As of March 11, 2005, the plaintiff had been seen or had his files reviewed at least 79 times by medical staff and consultants since he arrived at FCI Edgefield. Furthermore, he had been seen approximately 29 times by FCI medical staff or contract specialists with regard to his asthma. As noted by the defendants, the plaintiff has received constant treatment for his asthma through breathing treatments and prescriptions, including several short-term prescriptions for prednisone when it was medically indicated. While the plaintiff wanted prednisone for his asthma, medical documentation indicates that a person should not take such steroidal medication constantly due to the possible side effects and other contraindications. Disagreements between an inmate and a physician over the inmate's proper medical care do not state an Eighth Amendment claim unless exceptional circumstances are alleged. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

The plaintiff also alleges that defendants LaManna and Fueres-Rosario failed to provide adequate investigation, training, and supervision to staff, which resulted in staff continually denying him a soft shoe pass. Even assuming that the request for a soft shoe pass was a serious medical need, there is no evidence that the defendants were deliberately indifferent or otherwise violated his constitutional rights. The plaintiff was seen by medical staff at FCI Edgefield approximately 11 times for either complaints about his left ankle or left leg pain. He also had a radiologic study of his left ankle, and he was seen by an orthopedic specialist, who recommended stretching exercises and non-steroidal medication. The specialist did not recommend soft shoes. Again, disagreements between an inmate and a physician over the inmate's proper medical care do not state an Eighth Amendment claim unless exceptional circumstances are alleged. *Wright*, 766 F.2d at 849.

Based upon the foregoing, the plaintiff has failed to state a claim of deliberate indifference to his serious medical needs.

The plaintiff alleges defendants Smith, LaManna, and Fuertes-Rosario violated his constitutional rights because of their roles as supervisors. The doctrine of *respondeat superior* generally is inapplicable to §1983 suits. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928-29 (4th Cir. 1977). The plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994). The plaintiff has failed to show that the subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury. Further, there is no evidence that these defendants were indifferent to or authorized any such conduct.

The defendants also argue that they are entitled to qualified immunity. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights. Therefore, the defendants are entitled to qualified immunity.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the defendants' motion to dismiss or, in the alternative, for summary judgment be granted.

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

January 10, 2006

Greenville, South Carolina

18